IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

RICHARD FLOOD, ROBERTO CANTU,⠀⠀⠀⠀)
TERRANCE SMITH, PATRICK FLOOD,⠀⠀⠀)
JACQUELINE DRANKUS, EDWARD WALKER,⠀)
and DAVID KURCZ, on behalf of themselves and⠀)
a class of others similarly situated,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Plaintiffs,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
ROY DOMINGUEZ, individually and in his official⠀)⠀⠀2:08 cv 153
capacity as sheriff of Lake County, Indiana,⠀⠀)
CAREN JONES, individually and in her official⠀⠀)⠀⠀Judge Philip Simon
capacity as former warden of Lake County Jail,⠀)⠀⠀Magistrate Judge Paul Cherry
BENNY FREEMAN, individually and in his⠀⠀)
official capacity as warden of Lake County Jail, and⠀)
UNKNOWN LAKE COUNTY JAIL⠀⠀⠀)
SUPERVISORS,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Defendants.⠀⠀)⠀⠀JURY TRIAL DEMANDED

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION**

⠀⠀⠀⠀Plaintiffs, Richard Flood, Roberto Cantu, Terrance Smith, Patrick Flood, Jacqueline

Drankus, Edward Walker, and David Kurcz, through their counsel, Loevy & Loevy, respectfully

submit the following Memorandum in Support of their Motion for Class Certification.  The

Motion should be granted for the following reasons:

## I.  INTRODUCTION

⠀⠀⠀⠀By this Motion, the named Plaintiffs seek to represent approximately 16,000 other

detainees who have suffered abhorrent conditions of confinement in the Lake County Indiana

Jail holding cells.  As the Court will see from the evidence in this Motion, including affidavits

from 39 other former detainees, those detentions are inhumane and easily violate the requirements of the Fourteenth Amendment.

Also important for present purposes, the cruel conditions are common to each member of the class.  All of them were held in excess of 24 hours in cells so crowded that they had less than two feet of space per person, were forced to sleep on concrete, were given little if anything to eat, and the single toilet available to dozens of them was not enough to prevent filth from covering the floors.  Most of the class members had to endure these conditions for multiple days, and even weeks, waiting for the Jail to move then into a housing area.  The conditions are so intolerable that the Jail actually uses the holding cells to punish detainees for serious infractions like fighting by reassigning them from the housing divisions - where they received a mattress and three meals per day - back to cells where they sleep on a filthy concrete floor and compete with dozens of people for a portion of the paltry food provided.

Worse than the conditions themselves is the fact that the Sheriff's Department has inflicted the conditions knowingly, even callously, and despite the fact that the courts have entrusted the class members to its custody.  Indeed, the extraordinary overcrowding, lengthy detentions, and lack of bedding all represent policies of the Department itself.  And, as the evidence shows, the resulting conditions have been widespread and persistent for far too long – more than long enough to conclude that the Jail's administrators have been deliberately indifferent to the suffering of thousands.

In short, this case is one that calls out for justice and for reform, and Rule 23 provides the most efficient and comprehensive avenue to achieve it.   The Court should therefore certify the proposed class.

## II.  CLASS PROPOSED FOR CERTIFICATION

Plaintiffs propose certification of the following class under Federal Rule of Civil

Procedure 23(b)(3):

> All detainees of the Lake County, Indiana Jail who were confined in the
> Jail's holding cells for more than 24 hours on or after May 13, 2006.

The seven named Plaintiffs seek to represent this class.  See First Amended Complaint

("Complaint"), dckt. no. 28.

## III.  FACTS

**A.**      **Overview of the Lake County Jail Holding Cells**

Approximately 15,000 detainees are processed into Lake County Jail (the "Jail") each

year, and "each begins this process in the holding cell…" See Response to Plaintiff's Request for

Production by Defendants Dominguez and Freeman, number 14, Exhibit C hereto; and

Deposition of Sergeant John Dragomer ("Rule 30(b)(6) Dep."), Vol. I, Exhibit B hereto, at 34-36

(all detainees are placed into one of the holding cells directly after being booked into the Jail).[1]

There are seven such cells in the Jail.  See Rule 30(b)(6) Dep. Vol II, Exhibit A hereto, at 74

The ostensible purpose of the Jail's holding cells – according to the Jail's

representative – is to keep new admits detained while the staff "classifies" them, which means

determining where the detainees will be housed in the Jail.  See Exhibit B (Rule 30(b)(6) Dep.

Vol. I) at 60-61.  That is the standard purpose of a holding cell.  In accordance with this purpose,

such cells are not equipped to house detainees nor meet their regular human needs for more than

a short time.   In specific, the Jail holding cells consist only of a concrete floor with a few raised

---

[1] Sergeant John Dragomer was produced by the Defendants to represent the Jail, pursuant to Federal Rule
of Civil Procedure 30(b)(6), and provide binding testimony "concerning the policies and procedures of
the Lake County Jail with respect to the holding of detainees in holding cells."   See Exhibit B (Rule
30(b)(6) Dep. Vol. I) at 4.

concrete benches and a single toilet.  <u>See</u> Exhibit B (Rule 30(b)(6) Dep. Vol. I) at 56-60.  The

seven holding cells range in size from 15 by 15 feet to 20 by 30 feet but are otherwise uniform.

<u>See id.</u>; Exhibit A (Rule 30(b)(6) Dep. Vol II) at 74.

Unlike in the housing divisions of the Jail, the holding cells contain no beds or bunks

for detainees to sleep on, nor even, for that matter, mattresses or bedding to place on the concrete

floors.  <u>See</u> Exhibit B (Rule 30(b)(6) Dep. Vol. I) at 128-129.  Such rooms are not considered

appropriate to hold detainees for a period of time long enough that they would need to sleep.  <u>See</u>

the American Correctional Association's <u>Performance-Based Standards for Adult Local</u>

<u>Detention Facilities</u> ("ACA ALDF Standards") (requiring that "[e]ach inmate confined in a

cell/room is provided with the following: a sleeping surface and mattress that allows the inmate

to be at least 12 inches off the floor" (4-ALDF-1A-11)), attached hereto as Exhibit G, at 5.

Similarly, there are no provisions made in the holding cells for visitation, exercise, or personal

hygiene, although such provisions are incorporated into the housing divisions of the Jail.  <u>See</u>

Exhibit A (Rule 30(b)(6) Dep. Vol. II) at 43, 54-55, 96.[2]

**B.      The Class Members' Long-Term Detentions in the Holding Cells and the
          Resulting Brutal Conditions of Confinement**

The facts for purposes of this Motion are drawn from the declaration testimony of 39

class members describing their experiences and observations while in the holding cells; the Jails'

own computerized database of detainees admitted into the Jail and their cell assignments; the

Federal Rule of Civil Procedure 30(b)(6) deposition testimony of the Jail's appointed

---

[2] <u>Compare</u> Exhibit G (ACA ALDF Standards) at 91 ("Inmates have access to exercise opportunities and
equipment, including at least one-hour daily of physical exercise outside the cell" (4-ALDF-5C-01);
"Inmates have opportunities to participate in leisure-time activities outside their respective cell or room
on a daily basis" (4-ALDF-5C-02)) and 47 ("Articles necessary for maintaining proper personal hygiene
are available to all inmates" (4-ALDF-4B-06)).

representative, Sgt. Dragomer; and Plaintiffs' First Amended Complaint ("Complaint"). These

sources demonstrate that the following conditions are common within the Jail's holding cells.

### (1)  Overcrowding and Lengthy Detentions

The Jail holding cells are consistently overcrowded for long periods of time.   The

named Plaintiffs allege in their complaint, based on their own experiences, that the Jail often puts

dozens of people into each holding cell.  See Complaint at ¶11 ("Even though the cells are only

large enough to humanely hold a few people for a short time, the Defendants often pack dozens

of people into a cell for weeks at a time").  The declaration testimony from the 39 class

members, all of whom spent significant amounts of time in the cells, bears this out.  The

declarations are attached hereto as Exhibit D.

The class members' estimates of the extent of the overcrowding reveal that on

average, they endured confinement in a holding cell alongside approximately 32 other detainees.

See Chart Summarizing the Declarations ("Declarations Summary"), at column 1, Exhibit E

hereto.  In a 20 by 30 foot holding cell, this equates to less than 2 square feet of living space per

person.

By comparison, the American Correctional Association's national jail standards

require 35 square feet per detainee when they are held in a cell for more than 10 hours; 25 feet if

they are held for less than that.  See Exhibit G (ACA ALDF Standards) at 4 (multiple-occupancy

cells should "provide 25 square feet of unencumbered space per occupant.  When confinement

exceeds 10 hours per day, at least 35 square feet of unencumbered space is provided for each

occupant" (4-ALDF-1A-10)).  Even simple fire safety rules, which obviously do not address

human needs for space in a detention situation, require seven square feet per person.  See 674

IAC 13-2.5-11(4) ("The occupant load . . . [shall] not exceed one occupant per seven square feet").

       Moreover, the figures in Declarations Summary column 1 (Exhibit E) represent only the average population of the cells during the days and weeks that the declarants were confined there. When these declarants were asked to estimate the number of people detained in the holding cells with them when the cells were at their most crowded, declarants' estimates rose to an average of 42 people. Id. at column 2. In fact, some declarants reported being confined in the cells with 50 or more people at a time. See, e.g., Exhibit D (Declarations) at 23 (Ronald McCurdy II); 53 (Harold Shmitz); 57 (Michael Fields); 59 (Andrew Watts); and 75 (Gabriel Stokes).

       In addition, the class members had to endure these overcrowded living conditions for long periods. To prepare for this Motion, Plaintiffs obtained from Defendants a database of people admitted to the Jail during the class period. See Declaration of data analyst Joseph Freyer, at ¶2, Exhibit F hereto. The Jail's data shows that of the entire class of people held for more than 24 hours in the holding cells, some 12% were kept in the holding cells for a week or more. Id. at ¶4

       In addition, Plaintiffs themselves reported being held in the cells for an average of approximately 24 days before finally being assigned to a housing division or released from Jail. The 39 declarants reported being detained in the cells from between three and 21 days, with declarants reporting an average of nine full days of confinement in the holding cells at a stretch. See Exhibit E (Declarations Summary) at column 3; Complaint at ¶¶31, 37, 41, 44, 46, 51, 55 (Plaintiffs allege being confined between 4 days and 45 days in the holding cells).

### (2)  Sleep Deprivation

Despite the fact that the Jail routinely detains people in the holding cells for such long periods of time that they would obviously need sleep, the Jail makes absolutely no provision for this human need.  See Complaint at ¶14.

As confirmed by the Jail's Rule 30(b)(6) representative, detainees are not given anything to sleep on for the duration of their stay in the holding cells and therefore have to sleep on the cells' concrete floors or narrow concrete benches.  See Exhibit B (Rule 30(b)(6) Dep. Vol. I) at 45-46, 57-58.  This is despite the fact that the Jail has mattresses that they could provide to the detainees.  See id. at 121.

Thus detainees sleep directly on the concrete, and – because the cells are so crowded – they are often forced to sleep practically on top of each other.  See Complaint at ¶13. Plaintiffs described in their complaint the brutality of this system and the fact that it deprived them of any meaningful rest during their entire ordeals in the holding cells.  See id. at ¶¶1, 13-14. The experience was the same for the declarants, each of whom reports that it was extremely difficult to sleep in the cells.  See Exhibit E (Declaration Summary) at column 4.  See also, e.g., Exhibit D (Declarations) at 7 (Robert Estrada: "Because the cell was so crowded, we lay nearly on top of each other, which prevented me from getting meaningful sleep.  There was not enough floor space for all of the men to lie down, so some had to sit up while sleeping"). Also exacerbating the problem, the Jail keeps the artificial lights on in the holding cells for 24 hours per day and – as testified to by its representative – never dims them.  See Exhibit B (Rule 30(b)(6) Dep. Vol. I) at 58.

### (3) Inability to Maintain Personal Hygiene

Unlike the areas of the Jail meant for housing detainees, there are no showers in the holding cells, and detainees often go without bathing for their entire confinements in the cells. See Complaint at ¶19. Indeed, 31 of the 39 declarants reported that they were unable to clean their bodies the entire time they were in the cells, with the average length of detention being nine days. See Exhibit E (Declaration Summary) at columns 3, 5. The detainees also often remain in the same clothing they had on when they arrived at the Jail, which become soiled if they were not already dirty upon their arrival. See, e.g., Exhibit D (Declarations) at 66 (Antoine Dupree: "I spent all 18 days in my street clothes, including in the same underwear, and I was not given a shower. On the 14th day, we were taken out to change into a jail uniform, but not allowed to shower").

In fact, the Jail's representative testified that male detainees are not given underwear, and indeed often have their underwear taken away, although he does not know why this is the case. See Exhibits A (Rule 30(b)(6) dep. Vol. II) at 58 and B (Rule 30(b)(6) dep. Vol. I) at 84.

Similarly, the Jail does not provide the detainees with toothpaste, toothbrushes, or soap to clean their hands or bodies. See, e.g., id. at 10 (Gregory Shaw: "I could not brush my teeth because no toothbrush or toothpaste was provided in the 10 days in holding"); and 16 (Shanaro Ward: "no soap in the bathroom, no nothing").[3] Neither are detainees allowed access to the "indigent packages" (available to detainees in the Jail's general population) which contain at least some hygiene items. See Exhibit A (Rule 30(b)(6) Dep. Vol. II) at 54-55.

---

[3] Compare Indiana's County Jail Standards, which require that jail inmates "be provided with shaving materials, bar soap, toothbrush, and toothpaste." 210 IAC 3-1-10(b).

### (4) Unsanitary Conditions

As previously explained, the holding cells, which are designed for far fewer people and far shorter detentions than the Defendants use them for, contain only one toilet each.  See Exhibit B (Rule 30(b)(6) Dep. Vol. I) at 56-60; Complaint at ¶2.  With dozens or more people forced into each cell, the toilets are overwhelmed and often back-up and overflow onto the cell floors.  See, e.g., Exhibit D (Declarations) at 35 (Rodolfo Flores: "The toilet flooded soon after I got in the cell.  No one from the Jail ever came to fix the toilet.  There was human waste all over the floor.  The Jail never came to clean it up.")  Toilet paper is generally all used up or not provided at all.  See, e.g., id. at 6 (Nakeithen Gregory: "We were not given any toilet paper.  People asked the guards for some, but the guards never brought any.")  Even when working, the single toilet is insufficient for the needs of dozens or more people confined in the cell.  As a result, detainees often soil themselves or force themselves to hold bowel movements for days.  See, e.g., id. at 35 (Rodolfo Flores: "A couple of inmates defecated on themselves); 41 (Dolton Pippins: "I did not have a bowel movement the whole time in the holding cell [seven days] because of the condition of the bathroom").  Moreover, because the Jail provides no bedding, the detainees must sleep directly on floors that are covered in bodily fluids.  See, e.g., id. at 61 (Eric Kilbourne: "Men had to sleep in urine around the toilet").

In addition, many in the cells are sick from withdrawal, and sometimes, from the conditions in the cells themselves; the accommodations are not sufficient for the sanitary needs of these ill detainees.  See, e.g., id. at 63 (Kevin Johnson: "Two guys were coming down off of drugs.  One of them vomited all over himself, and he was never given anything to clean himself up with.  The other sick detainee defecated on himself") and 71 (Scott Decker: "Men were throwing up in the lunch bags, and throwing them on the floor").

9

As a result, and as attested to in the class members' declarations, the cells' walls and floors are often covered with feces, vomit, and blood. See, e.g., id. at 65 (Antoine Dupree). Moreover, unlike in the housing areas of the jail, detainees in the holding cells are not provided any means to clean the cells themselves.[4] See, e.g., id. at 67 (Ricky Dates: "The toilet was stopped up and flooded all over the holding cell. There was human waste all over the floor … We asked for a mop to clean it up ourselves. That request was denied. After hours of complaining, they did come to clean it up, but the trustee did not use any disinfectant or cleansing agents. They just mopped up the water and left.") Trash is spread throughout the cells. See, e.g., id. at 45, 47, 49; Complaint at ¶21.

The unsanitary conditions can produce skin infections or can compound illnesses that the detainees bring with them to the Jail. See, e.g., Exhibit D (Declarations) at 14 (Larry Molex: "There was one inmate that [had] multiple open sores all over his body, face and arms. He had been held in the … cell for four days already, and never saw a doctor"); 22 (Robert Shawn Bobby: "Several inmates had open wounds, and had to lay in urine and feces"); 73-74 (Francisco Gamez: "There was a guy with an open gunshot wound walking around"); Complaint at ¶¶2, 22.

Former detainee Dante Webb recalled the condition of his Jail holding cell, as follows:

> For all the men in the cell, there was only one toilet. There was only one sink. The sink did not work. You could not get any water out of it. There was mold all over the floor in the bathroom. There was blood, dried feces, and urine on the bathroom wall, and there was blood on the walls of the holding cell. There was blood on the floor. No one ever came to clean the cell. It was never swept or mopped. Because of the condition of the bathroom, I held my bowel movement the entire time I was in the cell. There were black flying bugs everywhere. The smell was sickening. It smelled like something died in the holding cell. There were men walking around with open, oozing sores.

---

[4] Compare Indiana's County Jail Standards, which require that "Jail officials make cleaning equipment, including mops, brooms, scouring cleanser, soap and disinfectant, available to inmates on a daily basis to assist inmates in meeting their cleaning responsibility." 210 IAC 3-1-9(b).

See Exhibit D (Declarations) at 43 (stating that he was detained in that holding cell for approximately seven days).

Dangerously unsanitary conditions also prevail in the women's holding cell. Former detainee Alaina Long described the conditions during her confinement there:

> For all the women in the cell, there was only one toilet. There was only one sink. The bathroom was awful. There was fungus growing up the wall behind the toilet. It was everywhere. There was dirt and feces stuck to the toilet. There were yellow stains all over the walls of the bathroom and the holding cell. There was urine on the floor. There were used sanitary napkins on the floor. No soap was ever given to any of us to clean ourselves while we were in the holding cell. There was garbage all around. The holding cell smelled like terrible musk. There is a drain in the middle of the holding cell. One inmate urinated down the drain in the middle of the room. That inmate was on her monthly cycle. No one came to clean up. Women washed their underwear in the sink with no soap.

Id. at 27. See also Complaint at ¶¶20, 48.

### (5) Extremes of Temperature / Inadequate Ventilation

Detainees are not provided any blankets or sheets with which to cover themselves, despite the fact that it can be extremely cold in the holding cells. See, e.g., Exhibit D (Declarations) at 78 (Michael Ivy: "It was freezing in there. Men were blowing their own breath in their hands, trying to warm up. Inmates put the paper bags that the lunches came in, over parts of their bodies to help keep warm") and 45-46 (Dennis Dates: "We slept on bare concrete floor – there was no mattress, pillow, sheet or blanket provided … It was ice cold in the holding cell"). The Jail's representative testified that he does not believe that the temperature in the holding area could be modified if the detainees complained that it was too hot or cold. See Exhibit A (Rule 30(b)(6) Dep. Vol. II) at 50.

In addition, the ventilation in the cells is inadequate, and the detainees often suffer from the overwhelmingly bad smells. See, e.g., Exhibit D (Declarations) at 63 (Kevin Johnson:

"It smelled so bad, I immediately got nauseated and light-headed"); 2 (Antoine Wilson: "The

holding cell smelled like dead bodies"); 60 (Andrew Watts: "It smelled so bad, that when I first

got there, the smell gave me a headache"); and 72 (Scott Decker: no ventilation).

### (6) Inadequate Nutrition

People confined in the Jail's holding cells are also deprived of adequate food.  As a

result, detainees lose weight precipitously on a diet consisting of – at best – a daily small cereal

portion, and bologna and jelly sandwiches.[5]  See Complaint at ¶23; Exhibit E (Declaration

Summary) at columns 11-13 (showing significant weight loss by detainees).  Although the class

members giving declarations were confined in their holding cell about nine days at a time on

average, 19 of them reported weight loss of up to five pounds, 14 of them reported weight loss

between six and ten pounds, and six of them reported weight loss in excess of ten pounds.  See

Exhibit E (Declarations Summary) at columns 12-13.  Recognizing the dramatic loss of weight

that the detainees suffer, guards jokingly refer to the little food the Jail does provide to the

holding cell detainees as the "Lake County diet."  See, e.g., Exhibit D (Declarations) at 48.

Additionally, detainees in the cells often do not even receive the paltry portions

allotted them, because the staff does not distribute the food directly to the detainees.  Rather,

staff slides trays through an opening in the cell doors, allowing the closer and stronger detainees

to keep the food for themselves.  See, e.g., id. at 54 (Harold Schmitz: "My lunch was taken,

because the guards just sent food through the trap door, and the young inmates took my food.  I

am in my fifties, so I could not fight them for my food.  When I asked the guards for food, I was

ignored") and 70 (Kevin Roy: "I saw other people get their lunch taken, because the guards just

sent food through the trap door").  Compare Indiana County Jail Standards, 210 IAC 3-1-12(b)

---

[5] Compare Indiana County Jail Standards, 210 IAC 3-1-12(b) ("One meal each day shall be served
hot").

("All meals shall be served under the supervision of a jail administrator or his designee") and Exhibit G (ACA ALDF Standards) at 45 ("Meals are prepared, delivered, and served under staff supervision" (4-ALDF-4A-17)).

### (7)  Reassignment for Punishment

A final fact that poignantly illustrates the brutal conditions in the holding cells is that the Jail actually uses them as punishment.

Detainees who already reside in the general population of the Jail are routinely reassigned back to holding when they commit (or are perceived to have committed) an infraction.  See, e.g., Exhibit D (Declarations) at 48 (Jerry Pellegrino: sent back to a holding cell for two weeks as punishment for arguing with a detainee); 30 (David Nix: sent back to holding for four days as punishment); and Complaint at ¶28.  The practice was acknowledged by the Jail's Rule 30(b)(6) representative.  See Exhibit A (30(b)(6) Dep. Vol. II) at 79-80 (detainees who have been placed into the general population can be removed and sent back to holding for fighting or other "rule violation" infractions).

### C.       The Jail's Policies Result in the Brutal Conditions

The above inhumane conditions stem primarily from two policy decisions regarding the holding cells: the failure to limit the duration of holding cell detentions and the failure to limit the number of persons who are detained there at one time.  Additional policy decisions that have affected the class include Defendants' refusal to provide bedding and hygiene materials despite the clear need for them, and the widespread practice of failing to address detainees' sanitation needs in the cells.   These policies and widespread practices are not only alleged by the named plaintiffs, see Complaint, passim, and evidenced in the above-described accounts of the 39 class members, but they are also - in large part - admitted to by the Jail itself.

For example, the Jail's representative, Sgt. Dragomer, testified that he knows of no policy limiting the amount of time that detainees may be confined in the holding cells.  <u>See</u> Exhibit B (Rule 30(b)(6) Dep. Vol. I) at 68.  He personally has witnessed people detained in the holding cells for as long as a week or more.  <u>See</u> Exhibit A (Rule 30(b)(6) Dep. Vol. II) at 78.

Sgt. Dragomer also testified that the Jail maintains no policy or practice whatsoever regarding how many people should be housed in each holding cell:

> Q:  [I]n any of the cells in the holding area are you aware of any maximum number of detainees that can be held in those cells?
> …
> Q: By policy
>
> A: Not that I'm aware of.
>
> Q: By practice, as opposed to policy, is there any maximum number of detainees that could be held in any of these cells?
>
> A: Not that I'm aware of.

Exhibit B (Rule 30(b)(6) Dep. Vol. I) at 59-60

> Q: At any time have you been told how many people the various holding cells had been designed to hold?
>
> A: No.
>
> Q: Do you have any knowledge at all as to how much people the holding cells were designed to hold?
>
> A: No, I do not.
>
> Q: Are you aware of any information that have ever been distributed to any correctional officer concerning the issue of how many people the holding cells were designed to hold?
>
> A: No, I do not.

Id. at 81.  Further highlighting the point, Sgt. Dragomer testified that he was unaware of any Jail policy that would be violated even by housing *more than 50 people* in one of the holding cells. See id. at 46-47.

Sgt. Dragomer also confirmed that it is the Jail's policy not to provide any bedding or mattresses to the detainees in the holding cells, despite the fact that there is nothing to sleep on but concrete.  See id. at 46, 121.  The same is true of hygiene items and indigent packages.  See Exhibit A (Rule 30(b)(6) Dep. Vol. I) at 54-55

## IV.  ARGUMENT

### A.    Applicable Standard

Plaintiffs seek to certify a damages class under Fed. R. Civ. P. 23(b)(3).   Such a class must meet each of the requirements of Rule 23(a), which are that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  A class that meets each of these requirements is properly certified as a (b)(3) class so long as the questions of law and fact common to the class predominate over individualized questions and a class action is the superior method of resolving the class members' claims.  Fed. R. Civ. P. 23(b)(3); Arreola v. Godinez, 546 F.3d 788, 793-94 (7th Cir. 2008).

Plaintiffs bear the burden of showing that the proposed class meets these requirements.  See Retired Police Ass'n v. City of Chicago, 7 F.3d 584, 596 (7th Cir. 1993).  As with a motion to dismiss, "[a]llegations made in support of class certification are considered true."  Harper v. Sheriff of Cook County, 2008 WL 4686148, at *1 (N.D. Ill. May 29, 2008).

Moreover, in deciding whether to certify a class, the court does not, as a general matter, reach the merits of the complaint.  Retired Chicago Police Ass'n, 7 F.3d at 598; Walker v. East Allen County Schools, 2008 WL 4367579, at *2 (N.D. Ind. Sept. 19, 2008) (citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met")).  See also Payton v. County of Kane, 308 F.3d 673, 677 (7th Cir. 2002); Bonner v. Team Toyota LLC, 2006 WL 3392942, at *1 (N.D. Ind. Nov. 21, 2006) ("Whether or not plaintiff will ultimately prevail on her claim is irrelevant to the present motion and the factors under Rule 23").

**B.      The Class Meets the Requirements of Rule 23(a)**

**(1)      The class is sufficiently numerous**

Federal Rule of Civil Procedure 23(a)(1) (the "numerosity prong") requires that the class be so numerous that it would be impracticable to join all of the members in a single action. This is not a difficult hurdle to meet.  Courts have generally found that 40 or so members are sufficient, and that in some cases even fewer than 40 class members will suffice.  See Lucas v. GC Services L.P., 226 F.R.D. 337, 340 (N.D. Ind. 2005) ("[b]ecause there is no mystical number at which the numerosity requirement is established, courts have found this element satisfied when the putative class consists of fewer than 40 members") (citations omitted); Parker v. Risk Management Alternatives, Inc., 206 F.R.D. 211, 213 (N.D. Ill. 2002) (class of "at least 39" was sufficiently numerous).  In addition, the exact size of the class need not be known; a court can rely on "common sense assumptions" and on plaintiffs' "good faith estimates of class size…" Lucas, 225 F.R.D. at 340 (citations omitted).  See also Marcial v. Coronet Ins. Co., 880 F.2d 954,

957 (7th Cir. 1989); <u>Young v. County of Cook</u>, 2007 WL 1238920, at *2 (N.D. Ill. April 25, 2007); <u>Lopez v. City of Chicago</u>, 2002 WL 31415767, at *4 (N.D. Ill. Oct. 25, 2002).

The seven named Plaintiffs – all of whom were detained four days or longer in the holding cells – have attached here affidavits of 39 other former holding cell detainees who spent multiple days in the holding cells.  <u>See</u> Exhibits D (Declarations) and E (Declarations Summary) at column 4 (holding cell detentions ranged from approximately three to 21 days); Complaint at ¶¶31, 37, 41, 44, 46, 51, 55.  Thus, just the class representatives and current affiants (numbering 46) are alone sufficient to make up a class.   However, the Jail itself has produced records demonstrating that thousands more detainees meet the class definition of having been held longer than 24 hours in the holding cells.  <u>See</u> Exhibit F (Declaration of data analyst Joseph Freyer) at ¶4 (the Jail's own data shows 16,303 instances of people being held longer than 24 hours in the holding cells).  And the class continues to grow every day.

Accordingly, joinder is impracticable.

**(2)    The class satisfies the commonality and typicality requirements**

**(a)    Commonality**

Under Rule 23(a)(2), plaintiffs generally must show only that there is at least one question of law or fact common to the class.  <u>See</u> <u>Bonner</u>, 2006 WL 3392942, at *2; <u>Young v. Cook County</u>, 2007 WL 1238920, at *5; <u>Adams v. R.R. Donnelly & Sons</u>, 2001 WL 336830, at *5 (N.D. Ill. April 6, 2001) ("Rule 23(a)(2)'s commonality requirement does not require that all or even most of the issues in the litigation be common issues; one common issue is enough").

Allegations of a policy or a widespread practice affecting the members of a putative class are usually sufficient to satisfy this requirement.  <u>Keele v. Wexler</u>, 149 F.3d 589, 594 (7th Cir. 1998) ("Common nuclei of fact are typically manifest where … the defendants

have engaged in standardized conduct towards members of the proposed class").  This is true

even where some detainees are treated more badly than others.  See Dunn v. City of Chicago,

231 F.R.D. 367, 373 (N.D. Ill. 2005) ("The fact that certain detainees were treated marginally

better on an *ad hoc* basis than others does not alter plaintiffs' allegations … that the interrogation

rooms are inherently unfit for human occupancy for more than a few hours") (citing Armstrong

v. Davis, 275 F.3d 849, 868 (9th Cir. 2001)); Thompson v. City of Chicago, 2002 WL 1303138,

at *4 (N.D. Ill. June 12, 2002) ("a suit challenging the constitutionality of a police department's

standard policy satisfies the prerequisite of commonality, even if there exist individual issues

regarding the application of that policy").

      The claims at issue here are, essentially, completely common amongst the class

members.  Indeed, whether the class members were to proceed as a class or in individual lawsuits

each will have to advance the same legal theories and prove the same facts using much the same

evidence in order to establish the Jail's liability for constitutional violations.

First, each class member will be seeking to prove that detentions in the holding cells for more

than 24 hours violate the Fourteenth Amendment.  To do so, they will rely on the same core

unlawful conditions of confinement: the overcrowding, the lack of bedding, the lack of hygiene

items, the lack of food.  Moreover, Plaintiffs alleged and have offered proof that the potentially

variable conditions such as abhorrent sanitation are in fact ubiquitous, making those issues

common as well.  Even so, the undisputable commonality of the core conditions is more than

enough to meet the commonality threshold.   See Young v. Cook County, 2007 WL 1238920, at

*5 (the requirement that there be "at least one question of fact common the class" is generally

satisfied by showing "that the defendants acted pursuant to policies and standard practices that

were common to all class members").

Second, each class member must prove that Sheriff's Department itself has municipal liability for the constitutional violations pursuant to <u>Monell v. Dept. Soc. Serv</u>.[6] To do so, each will rely on the Sheriff Department's established polices, including its failure to limit the number of people who may be detained in a holding cell, its failure to limit the amount of time people are confined in a holding cell, and its policies of not providing bedding nor hygiene items to those detainees. These are classic <u>Monell</u> inquiries, and courts have found that <u>Monell</u> challenges to jail conditions satisfy the commonality requirement. <u>See</u>, <u>e.g.</u>, <u>Arreola v. Godinez</u>, 546 F.3d at 798 (plaintiffs' claim that jail maintained unconstitutional medical policy satisfied commonality).

Similarly, each class member will need to prove that problems with sanitation and the like are widespread, such that the Jail's policymakers have shown deliberate indifference to the suffering caused by this condition. This too is a common question, sufficient to satisfy the commonality prong. <u>See</u>, <u>e.g.</u>, <u>Parish v. Sheriff of Cook County</u>, 2008 WL 4812875, at *4 (N.D. Ill. Oct. 24, 2008) (plaintiffs' challenge to Jail's practice of denying certain medications to detainees met the commonality requirement); <u>Jackson v. Sheriff of Cook County</u>, 2006 WL 3718041, at *4 (N.D. Ill. Dec. 14, 2006) (plaintiffs' challenge to the unsanitary methods of STD testing satisfied commonality requirement); <u>Phipps v. Sheriff of Cook County</u>, 249 F.R.D. 298, 301 (N.D. Ill. 2008) (jail detainees' allegations of widespread violations of the Americans with Disabilities Act satisfied commonality requirement); <u>Dunn v. City of Chicago</u>, 231 F.R.D. 367, 373 (allegations of police department's practice of subjecting detainees to unconstitutional conditions of confinement satisfied commonality).

---

[6] <u>Monell v. Dept. of Soc. Serv.</u>, 436 U.S. 658 (1978). Under <u>Monell</u> and its progeny, a government agency is liable for a constitutional violation caused by its policies or by a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988) (citation omitted).

(b)    **Typicality**

Rule 23(a)(3) requires that the claims of the class representatives be typical of those of the class as a whole. Typicality exists so long as the named plaintiffs' claims arise from the same practices that give rise to the claims of the other class members, and the claims are based on the same legal theories. Keele, 149 F.3d at 595.

Commonality and typicality overlap and a finding of one usually results in a finding of the other. Adams, 2001 WL 336830, at *5; see also General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 158, n. 13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence"). Some differences between the class members' particular experiences in the cells will not defeat typicality. De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983) ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact").

Plainly, each of the named Plaintiffs will have to challenge the same Jail practices as the absent class members they seek to represent, and all are relying on the same legal theories as to why the practices are unlawful. Specifically, Plaintiffs and each class member allege that Defendants are liable for the constitutional violations they suffered because the Sheriff maintains unconstitutional policies and because the Defendants were deliberately indifferent to the widespread pattern of the constitutional violations they suffered. See St. Louis v. Praprotnik, 485 U.S. at 127; Monell, 436 U.S. 658. Even though the lengths of the holding cell detentions

vary within the class, "such issues will not destroy typicality, because 'the likelihood of some range of variation in how different groups of new detainees were treated does not undermine the fact that the claims of each class [member] share a common factual basis and legal theory.'" Streeter v. Sheriff of Cook County, 2009 WL 928611, at *3 (N.D. Ill. April 7, 2009) (citing Young, 2007 WL 1238920, at *6).  See also Dunn, 231 F.R.D. at 373.

Plaintiffs therefore meet their burden to show typicality.

**(3)    Adequacy of Representation**

Under Rule 23(a)(4), the class representatives and their counsel must "fairly and adequately protect the interests of the class."  This requirement has two elements.  First, plaintiffs' counsel must be "competent, qualified, experienced, and able to vigorously conduct the litigation."  Walker v. East Allen County Schools, 2008 WL 4367579, at *3.  Second, the named plaintiffs must not have "'antagonistic or conflicting claims with other members of the class,'" and must have a "'sufficient interest in the outcome of the case to ensure vigorous advocacy.'"  Id. (citation omitted).

Defendants presumably acknowledge undersigned counsel's competency and ability to litigate this case.  Plaintiffs' counsel have represented plaintiffs in multiple class action suits and in suits relating to conditions of confinement.  See, e.g., Young v. County of Cook, 2009 WL 971675, at *19 (April 2, 2009) (granting summary judgment in favor of classes of detainees strip searched at Cook County Jail); Dunn, 231 F.R.D. at 377-78 (granting class certification to classes of people held in Chicago police stations based on classes' length of detentions and conditions of confinement).  Regarding the second Rule 23(a)(4) requirement, there is absolutely no evidence to suggest that any of the class representatives are antagonistic to any absent class member or that they do not have a sufficient interest to vigorously pursue the claims.

21

**C.        The Class Meets the Requirements for Certification Under Rule 23(b)(3)**

Certification of a Rule (b)(3) class requires that: 1) "common questions of law or fact must predominate, but they need not be exclusive" and 2) the class action must be "superior to other available methods for the fair and efficient adjudication of the controversy."  Bonner, 2006 WL 3392942, at *4-5.

In considering whether the common questions predominate over individual ones, courts focus for the most part on questions going to liability, as it is not at all uncommon for issues of proof to vary when it comes to damages.  Arreola, 546 F.3d at 801 ("[a]lthough the extent of each class member's personal damages might vary, district judges can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts"); Hobson v. Lincoln Ins. Agency, Inc., 2001 WL 648958, at *2 (N.D. Ill. June 7, 2001) (The "possibility of individualized damage inquiries does not defeat class certification even if individual hearings ultimately may be required") (citations omitted); Gary v. Sheahan, 1999 WL 281347, at *2 (N.D. Ill. Mar. 31, 1999) ("The Seventh Circuit has found that it is common for Rule 23(b)(3) class actions to involve differing levels of injury and damages for different class members; however, that does not mean that certifying a class under Rule 23(b)(3) is incorrect").  See also Blanford v. St. Vincent Hosp. and Health Care Center, Inc., 2009 WL 500527, at *8 (S.D. Ind. Feb. 27, 2009); Parish, 2008 WL 4812875, at *6.

Moreover, where liability is predicated upon the constitutionality of a policy or a common course of conduct towards each member of the class, the predominance requirement generally will be satisfied.  Calvin v. Sheriff of Will County, 2004 WL 1125922, at * 4 (N.D. Ill. May 17, 2004) ("'when the class is challenging a uniform policy, the validity of that policy predominates over individual issues and class certification is appropriate'") citing Blihovde v. St.

Croix County, Wis., 219 F.R.D. 607, 620 (W.D. Wis. 2003).  See also Young v. County of Cook, 2007 WL 1238920, at *7 ("When a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation"); Rahim v. Sheahan, 2001 WL 1263493, at *14 (N.D. Ill. 2001) ("the predominance requirement of Rule 23(b)(3) [is] satisfied by the allegations of standardized conduct, at least for purposes of liability [and] individual damages issues . . . can be addressed through the creation of subclasses").

Here, the putative class bases its claims on the Jail's common course of conduct of keeping its detainees in cruelly overcrowded holding cells with no sufficient provision for their human needs for sleep, hygiene, food, sanitation and bodily movement.  The class members all rely on the same legal theories and facts to prove their case.   For such reasons, "[c]ourts routinely address conditions of confinement claims in class actions."  Dunn, 231 F.R.D. at 377 (citing, inter alia, Rhodes v. Chapman, 452 U.S. 337 (1981)).  See also Davenport v. DeRobertis, 844 F.2d 1310 (7th Cir. 1988); Young v. County of Cook, 2007 WL 1238920; Rahim, 2001 WL 1263493; Lewis v. Washington, 197 F.R.D. 611 (N.D. Ill. 2000)).

Additionally, a class action is the clearly superior method for pursuing Plaintiffs' claims.  From the standpoint of judicial economy there can be little doubt that a single class action challenge to the Defendants' actions is superior to the other method for addressing those claims, which would be a multiplicity of federal civil rights lawsuits all addressing essentially the same claims and questions of fact.  See Bonner, 2006 WL 3392942, at *5 (where a "dispute contains a set of legal and factual issues that are shared by the members of the class … class certification is more efficient than multiple individual suits at dealing with these common questions"); Cancel v. City of Chicago, 254 F.R.D. 501, 512 (N.D. Ill. 2008) (individual lawsuits challenging the same municipal policies "would require multiple courts to evaluate the same

evidence and analyze the same policies and practices in what would amount to a wastefully inefficient enterprise").

Second, many of the class members would likely forfeit their claims if they could not pursue them as a class, due to the expense of litigation, the difficulty of prevailing in a <u>Monell</u> case, and – indeed – the fact that they may not be aware of their rights to relief. Tellingly, despite the brutal nature of the holding cell detentions, none of the named plaintiffs or declarants have initiated individual suits challenging them. Thus, the absent class members do not have an interest in bringing individual cases but, rather, need the efficiencies of the class action mechanism to pursue their claims at all. Moreover, from the standpoint of reform, a class action provides the best chance of bringing meaningful change to the Lake County Jail's practices. The cost of a relatively few individual judgments for damages is not going to cause the Sheriff's Department to reform an ingrained system.

Finally, a class action is a perfectly manageable way of trying the constitutional claims at issue in this case. In fact, there is very little different in an individual trial to prove the Jail's liability for the extended holding cell detentions than would be involved in a classwide trial. The proof is essentially the same, as both an individual plaintiff and the class seek to hold the Jail liable for the same unconstitutional policies and for the same widespread practices alleged regarding the holding cell detentions. <u>See Dunn</u>, 231 F.R.D. at 373 ("As plaintiffs correctly observe, while the legality of each condition of confinement must be determined on a case by case basis, each class plaintiff's experience does not require individual analysis. That is, if it is unlawful to hold detainees for prolonged periods in interrogation rooms without a toilet, bed, or regular meal service, it is unlawful as to each class member regardless of factual variations in their actual experiences while in custody").

Thus, Rule 23(b)(3) is the appropriate mechanism to address the issues raised in this suit.

## Conclusion

For the foregoing reasons, the Court should:

(1) Certify the Class under Rule 23(b)(3);

(2) Appoint Plaintiffs to be the representatives of the Class; and

(3) Appoint Plaintiffs' counsel as counsel for the Class.

RESPECTUFLLY SUBMITTED,

/s/ Samantha Liskow
Attorneys for Plaintiffs

Arthur Loevy
Jon Loevy
Michael Kanovitz
Samantha Liskow
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
(312) 243-5900

**<u>Notice of Filing/Certificate of Service</u>**

   I, Samantha Liskow, an attorney, certify that I filed the attached Motion for Class Certification on April 20, 2009 by CM/ECF electronic filing, which was served through CM/ECF upon defense counsel.


         <u>S/ Samantha Liskow</u>